## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**BLACK WATER MANAGEMENT, LLC,**

        **Plaintiff,**

v.                                 **Civil Action No. 3:15cv365**

**MARK D. SPRENKLE,** *et al.,*

        **Defendants.**

### MEMORANDUM OPINION

    This matter comes before the Court on three motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1)[1] and 12(b)(6):[2] (1) Defendant Mark D. Sprenkle's Motion to Dismiss (the "Sprenkle Motion to Dismiss"), (ECF No. 17); (2) Defendants TBT Network, LLC, d/b/a Tim Be Told ("TBT"), Timothy Ouyang, Luan Nguyen, Jacob James Barredo, and Andrew Daniel Chase's (collectively, the "TBT Defendants") Motion to Dismiss  (the "TBT Motion to Dismiss"), (ECF No. 19); and, (3) Defendants Kevin Healy and Colin Healy's (collectively, the "Healy Defendants") Motion to Dismiss (the "Healy Motion to Dismiss"), (ECF No. 28) (collectively, the "Motions to Dismiss").

    Plaintiff Black Water Management, LLC ("BWM") has responded to each motion to dismiss. (ECF Nos. 26, 27, 31.)  The TBT Defendants and the Healy Defendants have replied, (ECF Nos. 30, 32), but Sprenkle has not, and the time to do so has expired.  The Court dispenses with oral argument because the materials before it adequately present the facts and legal

---

[1] "[A] party may assert the following defense[ ] by motion: (1) lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1).

[2] A party may move to dismiss a claim against it based on the "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

contentions, and argument would not aid the decisional process. This matter is ripe for disposition. For the reasons that follow, the Court will grant the Motions to Dismiss.

## I.  Federal Rule of Civil Procedure 12(b)(1) Standard

In a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenging the Court's subject matter jurisdiction, the burden rests with the plaintiff, as the party asserting jurisdiction, to prove that federal jurisdiction is proper. *See Int'l Longshoremen's Ass'n v. Va. Int'l Terminals, Inc.*, 914 F. Supp. 1335, 1338 (E.D. Va. 1996) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) can attack subject matter jurisdiction in two ways. First, a Rule 12(b)(1) motion may attack the complaint on its face, asserting that the complaint fails to state a claim upon which subject matter jurisdiction can lie. *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338; *see also Adams*, 697 F.2d at 1219. In such a challenge, a court assumes the truth of the facts alleged by plaintiff, thereby functionally affording the plaintiff the same procedural protection he or she would receive under Rule 12(b)(6) consideration. *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338; *see also Adams*, 697 F.2d at 1219.

A Rule 12(b)(1) motion may also challenge the existence of subject matter jurisdiction in fact, apart from the pleadings. *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338; *see also Adams*, 697 F.2d at 1219. In such a case, because a party challenges the court's "'very power to hear the case,'" the trial court is free to weigh evidence to determine the existence of jurisdiction. *Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). No presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial

court from evaluating for itself the merits of jurisdictional claims. *See id.*; *see also Adams*, 697 F.2d at 1219.

If the facts necessary to determine jurisdiction are intertwined with the facts central to the merits of the dispute, the proper course of action is for the court to find that jurisdiction exists and then to resolve the factual dispute on the merits unless the claim is made solely for the purpose of obtaining jurisdiction, or is determined to be wholly insubstantial and frivolous. *Bell v. Hood*, 327 U.S. 678, 682–83 (1946); *United States v. North Carolina*, 180 F.3d 574, 580 (4th Cir. 1999); *Adams*, 697 F.2d at 1219.

## II. Procedural and Factual History

### A.    Procedural History[3]

On June 16, 2015, BWM filed its Complaint against Sprenkle, the TBT Defendants, the Healy Defendants, and Steve Vorlop. (ECF No. 1.) The Complaint alleges seven counts:

Count I:       Declaratory judgment that Sprenkle obtained no membership interest in BWM, (Compl. ¶¶ 85–88);

Count II:      Conspiracy to tortiously interfere with contract and/or business expectancies against all defendants, (*id.* ¶¶ 89–95);

Count III:     Conspiracy to breach fiduciary duties against all defendants, (*id.* ¶¶ 96–101);

Count IV:      Conspiracy to convert assets of BWM against all defendants, (*id.* ¶¶ 102–09);

Count V:       Conversion against Sprenkle, (*id.* ¶¶ 110–13);

Count VI:      Breach of contract against TBT and Colin Healy, (*id.* ¶¶ 114–17); and,

---

[3] Although not referenced in the Complaint, this action is not the first involving some of the listed parties. The opposing motions highlight, and in some instances, rely upon, past events or previous positions taken in litigation among these parties. The Court assumes some familiarity with those cases. *See Travelers Cas. & Sur. Co. v. Schur*, No. 3:15cv60, 2015 WL 7571821 (E.D. Va. Nov. 24, 2015); *Schur v. Sprenkle*, 86 Va. Cir. 455 (2013); *Schur v. Sprenkle*, 84 Va. Cir. 418 (2012).

| Count VII: | An accounting from TBT and Colin Healy to determine amounts owed to BWM under artist contracts and an accounting from Sprenkle to determine the amount of money wrongfully converted from BWM, (*id.* ¶¶ 118–22). |
|---|---|

On July 30, 2015, Vorlop filed a motion to dismiss for lack of subject matter jurisdiction. (ECF No. 8.) BWM responded, (ECF No. 13), and Vorlop replied, (ECF No. 14). On August 27, 2015, the Honorable James R. Spencer, United States District Judge, issued a Memorandum Opinion and Order denying Vorlop's Motion to Dismiss.[4] (ECF Nos. 15, 16.) In view of the evidence then before the Court, Judge Spencer reasoned that "material jurisdictional facts [were] unknown." *Black Water Mgmt. LLC v. Sprenkle*, No. 3:15cv365, 2015 WL 5089367, at *6 (E.D. Va. Aug. 27, 2015). Vorlop filed his answer on September 10, 2015. (ECF No. 25.)

Following Judge Spencer's August 27, 2015 opinion, the defendants filed the Motions to Dismiss now before the Court. The Sprenkle Motion to Dismiss asks this Court to dismiss BWM's case for lack of subject matter jurisdiction for two reasons: (1) because BWM fails to properly allege jurisdiction; and, (2) because Sprenkle, a domiciliary of Virginia, is a member of BWM, thereby destroying any diversity of citizenship between BWM and the Virginia defendants. The Sprenkle Motion to Dismiss otherwise argues that Counts II, III, IV, and V are barred by the statute of limitations and that BWM fails to state a claim upon which relief can be granted with respect to Counts I, II, III, and IV.

The TBT Motion to Dismiss repeats Sprenkle's arguments that the Court lacks subject matter jurisdiction. The TBT Motion to Dismiss also contends that Counts II, III, IV, VI, and VII are barred by the statute of limitations and that BWM's claims are barred by both the

---

[4] This case was reassigned to the undersigned judge on September 1, 2015. (ECF No. 23.)

*Colorado River* abstention doctrine[5] and principles of judicial estoppel.  The TBT Motion to Dismiss further submits that BWM fails to state a claim upon which relief can be granted on Counts II, III, IV, VI, and VII.  The Healy Motion to Dismiss also challenges the Court's subject matter jurisdiction and, in the alternative, seeks dismissal because BWM fails to state a claim upon which relief can be granted.  In addition, the Healy Defendants argue that at least three of BWM's claims are time-barred.

### B.    Summary of Allegations in the Complaint

The allegations in the Complaint concern the purported formation and ensuing exploitation of BWM, a talent management company.  Jacob A. Schur[6] and Sprenkle had an agreement to establish BWM that required Schur to invest tens of thousands of dollars and Sprenkle to assign to BWM two management contracts.  Sprenkle, however, allegedly utilized BWM for his own financial gain, using company assets to "bankroll" his expenses while benefitting from business opportunities made available to him through his affiliation with BWM.  (Compl. ¶ 2.)  Sprenkle ultimately enlisted the help of the other defendants, who—according to BWM—assisted him in concealing his conversion of company assets.  Additionally, BWM alleges that the defendants executed a scheme to repudiate contracts between BWM and both TBT and Colin Healy.  The Court summarizes the factual allegations in greater detail below.

### 1.    The Formation of BWM

In or around May 2008, Schur met Sprenkle as a result of their shared affiliation with the band Old School Freight Train.  Sprenkle informed Schur that he owned a company called "Black Water Management LLC" and that he had personal management contracts with Colin

---

[5] *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).

[6] Schur is not a party to the action.  According to BWM, however, Schur is its lone member.  Schur signed the Complaint, seemingly on behalf of BWM.

Healy & the Jetskis (the "Jetskis") and solo artist Jesse Harper.  In an email to Schur on May 28, 2008, Sprenkle specifically represented that he had invested $71,230.51 in the Jetskis and Harper, including $30,160 to record the Jetskis' first recording at "Cherokee Studios."  (*Id.* ¶ 24.) Schur later discovered that Sprenkle had made no substantial investments in the Jetskis or Harper and that no such payment had been made to "Cherokee Studios," which was actually a "makeshift" recording studio in the basement of Sprenkle's father's home.  (*Id.* ¶¶ 25–26.)

Prior to Schur's discovery, however, Sprenkle convinced Schur to collaborate with him in a joint venture to develop a talent management company.  Sprenkle asked Schur to invest in the fictitious "Black Water Management LLC," but Schur declined.  (*Id.* ¶ 29.)  Schur then suggested that the two form a new company, and Sprenkle agreed.  Sprenkle convinced Schur to retain the "Black Water Management LLC" name.  (*Id.*)  Schur, a "nascent attorney," then prepared an operating agreement titled "Operating Agreement of Black Water Management LLC" (the "Operating Agreement").  (*Id.* ¶¶ 30, 32; *id.* Ex. A, ECF No. 1-1.)  The Operating Agreement named Schur and Sprenkle as "Managing Members" and stated that Sprenkle was to receive a 50% membership interest in BWM as consideration for (1) the assignment of the purported management contracts with the Jetskis and Harper and (2) a 50% assignment of the management contract with Old School Freight Train.  (*Id.* ¶¶ 33–34.)  To obtain his interest in BWM, Schur had to invest $34,675 and assign his 50% interest in the band.  On June 19, 2008, Sprenkle executed an assignment agreement that appeared to assign the management contracts to BWM.  Schur, meanwhile, invested $49,675 in BWM, which included the $34,675 investment required by the Operating Agreement.

Although Schur prepared the Operating Agreement, Sprenkle did not fulfill his promise to prepare and submit documentation to the Virginia State Corporation Commission that would

have created BWM as a recognized entity. Sprenkle, however, represented to the Internal Revenue Service that BWM existed, which permitted him to obtain an Employee Identification Number. Sprenkle also opened a bank account at First Market Bank by submitting an "Affidavit of Limited Liability Company" that falsely stated that BWM was "validly organized under the laws of the State/Commonwealth of Virginia" and that Sprenkle was the sole and exclusive owner of BWM. (*Id.* ¶¶ 41–42) Thus, Sprenkle was able to deposit the checks issued by Schur into a bank account controlled solely by Sprenkle. Sprenkle did not form BWM until October 27, 2008, when he backdated the articles of organization.

### 2.  Colin Healy's Management Agreement

In the fall of 2008, Sprenkle represented to Schur that Colin Healy wanted to sign an "updated" management agreement. (*Id.* ¶ 44.) At the time, Schur was unaware that neither Colin Healy nor the Jetskis had a management agreement with Sprenkle or BWM in the first place. At a meeting to discuss the so-called updated agreement, Schur discovered that the Jetskis had never heard of "Cherokee Studios" and that their first recording was made in Sprenkle's father's home. (*Id.* ¶ 45.) Colin Healy then assured Schur that he would repay the money Sprenkle had claimed to have spent on the Jetskis' behalf.

On December 30, 2008, Schur presented to Sprenkle a non-final draft of the "updated" agreement. (*Id.* ¶ 49.) Despite the agreement not being in final form, Sprenkle presented it to the Jetskis for their signatures on December 31, 2008. This allegedly precluded Schur from discovering that no management agreements existed prior to the "updated" agreement. (*Id.*) The Jetskis executed the agreement, and Schur added his signature on February 26, 2009. The agreement provided that the Jetskis would pay BWM 18% of their future earnings.

In January 2010, Schur pressured Sprenkle into providing him with proof that he invested $63,259.89 in the Jetskis. On May 19, 2010, Colin Healy and his father, Kevin Healy, sent

Schur an email making excuses for Sprenkle's delay in producing such proof. Specifically,

Colin Healy informed Schur that he and his father contacted Sprenkle about money "owed" to

BWM despite Colin Healy's intent not to pay anything. (*Id.* ¶¶ 52–53.) Colin Healy's tactics

delayed any request for an accounting by Schur. On June 2, 2010, Schur, Sprenkle, and Colin

Healy discussed Sprenkle's investment via teleconference. Colin Healy again covered for

Sprenkle and informed Schur that he and Sprenkle would handle the matter themselves.

### 3.   The TBT Management Agreement

On July 16, 2008, BWM signed TBT to a management agreement that would provide

BWM with 18% of TBT's gross earnings. Schur claims he invested thousands of hours in TBT

and loaned the band at least $35,651.68. Schur, however, has never been compensated for his

work nor reimbursed for the loans provided to TBT.

### 4.   The Defendants' Continued Concealment

On June 3, 2010, Schur sent Sprenkle a demand letter that formally requested an

accounting, including a request for documentation verifying the amounts paid on behalf of Colin

Healy. Sprenkle informed TBT of Schur's demands and advised the band that he wanted to

separate from Schur and "destroy" BWM. (*Id.* ¶ 63.) Sprenkle shared with TBT BWM's

confidential dissolution procedures, which—if undergone—provide artists the opportunity of

choosing either Sprenkle or Schur as their manager. Sprenkle then had similar meetings with the

Healys.

On June 6, 2010, Nguyen emailed the other TBT Defendants, Vorlop, and Nguyen's

wife. Nguyen stated that TBT intended to partner with Sprenkle instead of Schur. According to

Nguyen's email, Sprenkle informed the group that the plan was for Vorlop and Sprenkle to tell

Schur that they did not want him "as part of the team anymore" before offering to buy him out.

The email also noted that TBT had the option of following the confidential dissolution

procedures, while feigning ignorance about the "talk going on behind [Schur's] back." (*Id.* ¶ 66.) Nguyen suggested that revealing that TBT had been in talks with Sprenkle "feels kinda like stabbing [Schur] in the back." (*Id.*) In response, Ouyang indicated that he favored following the confidential dissolution procedures, so as to avoid an appearance that TBT was "screwing [Schur] over." (*Id.* ¶ 67.)

TBT, Sprenkle, Vorlop, Colin Healy, and Kevin Healy discussed the matter a few days later and ultimately opted for a different strategy. TBT and Colin Healy agreed to send letters to BWM unilaterally repudiating their management agreements while expressing dissatisfaction with Schur and Sprenkle. TBT sought to partner with Sprenkle, Sprenkle's wife, and Vorlop as their new managers, while Colin Healy and Kevin Healy simply wanted out of Colin Healy's BWM contract. Similar letters were then emailed to BWM on June 16, 2010, and July 2, 2010, respectively. According to BWM, subsequent emails demonstrated that the TBT Defendants purposefully avoided communication with Schur and sought to continue their relationship with Sprenkle. The artists then purportedly attempted to coerce BWM into releasing them from their management agreements. Ouyang, for instance, threatened to quit music. BWM, however, did not sign a release of TBT's management agreement.

On September 15, 2010, Sprenkle emailed Schur a copy of a settlement proposal from Colin Healy, which asked for a release from Colin Healy's management agreement in exchange for a promise to repay the money Sprenkle invested in the Jetskis. The proposal indicated that Colin Healy owed $64,960, but, according to BWM, Colin Healy falsely certified its accuracy. Indeed, neither Colin Healy nor Kevin Healy received from Sprenkle any proof of the figures set forth in the proposal. On September 21, 2010, Sprenkle informed Schur that he was wrapping up BWM's affairs and that the artists no longer wished to work with BWM or Sprenkle.

Nonetheless, Sprenkle continued working with TBT and Colin Healy. Among other things, BWM seeks compensatory damages from all defendants, jointly and severally, in the amount of $250,000.

### III. Analysis

Before the Court are myriad challenges to the Complaint submitted by eight defendants in three motions to dismiss. Among the issues raised are whether BWM states a claim upon which relief can be granted, whether judicial estoppel precludes BWM from making certain arguments, and whether Virginia's statute of limitations bars BWM's claims. The Court need not, and cannot, address these substantive issues if it first concludes that it does not have subject matter jurisdiction over this case. Although BWM properly pleads subject matter jurisdiction, the Court cannot find that diversity jurisdiction exists apart from the pleadings.

### A.     The Court Cannot Find that Diversity Jurisdiction Exists on the Record Presented by the Parties

In view of the evidence before the Court, BWM cannot invoke federal subject matter jurisdiction under 28 U.S.C. § 1332.[7] BWM alleges that Schur, a domiciliary of Colorado, is its lone member. Because the citizenship of a limited liability company in a diversity action is the citizenship of all its members, BWM properly alleges that it is a citizen of only Colorado, thereby making the entity diverse from the non-Colorado defendants. Thus, to the extent the defendants bring a facial challenge under Rule 12(b)(1), their argument does not persuade. However, apart from the pleadings, the evidence before the Court fails to prove that Schur was the lone member of BWM at the time the case was filed.

---

[7] Section 1332 confers subject matter jurisdiction when the parties are diverse and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a).

### 1.   **BWM Properly Pleads Federal Subject Matter Jurisdiction**

As already determined in the August 2015 Opinion, by alleging that BWM constitutes a one-member limited liability company that is diverse from all defendants, BWM properly alleges diversity jurisdiction on the face of the Complaint. As pleaded, diversity exists. "Federal courts are courts of limited jurisdiction . . . [and] possess only that power authorized by the Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). BWM brings this action pursuant to 28 U.S.C. § 1332 and claims that complete diversity exists between BWM and the defendants, and that the amount in controversy exceeds $75,000.

For purposes of determining citizenship, a natural person is deemed a citizen of the state in which he or she is domiciled, *see Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 145 F.3d 660, 663 (4th Cir. 1998), while the citizenship of a limited liability company is determined by the citizenship of all of its members, *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011) (citation omitted). BWM defines the citizenship of each of the parties as follows:

- BWM: "[A]n unincorporated entity organized under the laws of the Commonwealth of Virginia." (Compl. ¶ 11.)

- Schur: A resident[8] of Colorado.

- Sprenkle: A resident of the Commonwealth of Virginia.

- Colin Healy: A resident of the Commonwealth of Virginia.

- Kevin Healy: A resident of the Commonwealth of Virginia.

- Ouyang: A resident of California.

---

[8] While the Complaint uses the term "resident" instead of "citizen" or "domiciliary," "this Court has previously noted that the simple 'allegation that plaintiff and defendant reside in different states provides a sufficient basis on which to sustain diversity jurisdiction.'" *Britton v. Gardner*, No. 3:14cv683, 2015 WL 163382, at *6 (E.D. Va. Jan. 13, 2015) (citation omitted). BWM attaches to its response to the Sprenkle Motion to Dismiss an affidavit stating that Schur resides in Colorado and intends to remain there indefinitely. (Schur Aff. ¶ 5, ECF No. 26-2.)

• Nguyen:  A resident of the Commonwealth of Virginia.

• Barredo:  A resident of Washington, D.C.

• Chae:  A resident of California.

• Vorlop:  A resident of the Commonwealth of Virginia.

BWM further alleges that Schur is its sole member.  Thus, taking BWM's allegations as true, BWM is a domiciliary of Colorado and complete diversity exists.  *See Cent. W. Va. Energy Co.*, 636 F.3d at 103 (citation omitted).

## 2.   Evidence Apart from the Pleadings Does Not Establish that the Court Has Federal Subject Matter Jurisdiction

In view of evidence apart from the pleadings, the Court cannot conclude that it has subject matter jurisdiction over BWM's claims.  On the record before the Court, BWM is a citizen of both Colorado and Virginia.  Therefore, complete diversity does not exist between the parties.

### a.   Standard for Weighing Extrinsic Evidence Under a Rule 12(b)(1) Challenge

While the ultimate burden of proving jurisdiction falls on BWM, when considering extrinsic evidence, district courts "should apply the standard applicable to a motion for summary judgment."  *Richmond, Fredericksburg & Potomac R.R. Co.*, 945 F.2d at 768.  The district court must therefore view the facts and "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion."  *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 817 (4th Cir. 1995).  Only when "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law" should the Court grant a motion to dismiss based on extrinsic evidence.  *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citation omitted).  This standard provides the lens through which the Court assesses extrinsic evidence under the defendants' collective 12(b)(1) challenge.

12

**b.     The Operating Agreement Did Not Automatically Divest
         Sprenkle of Member Status**

In its August 2015 Opinion, this Court determined that both Sprenkle and Schur were

Managing Members of BWM at its June 2008 inception.  The Operating Agreement

"presuppose[d] that the person making the initial contributions is already a member," rendering

Sprenkle and Schur Members even before any contributions were made.  *Black Water Mgmt.*

*LLC v. Sprenkle*, No. 3:15cv365, 2015 WL 5089367, at *5 (E.D. Va. Aug. 27, 2015) (Spencer,

J.).  The Court also found that the Operating Agreement did not specify a deadline for

contributing that, if missed, would breach the Agreement.  *Id.* at *6.  The Court noted, however,

that Paragraph 12.9 of the Operating Agreement provided that if Sprenkle could not, or chose

"not to contribute capital in proportion to his membership interest, *his proportional membership*

*shall be reduced* to reflect the amount of capital he actually contributed."  *Id.*  (emphasis added).

Thus, the Court held that, when considered alongside Virginia Code § 13.1-1023.1,[9]

Paragraph 12.9 gave Schur a potential remedy for breach of the Operating Agreement because

"Sprenkle's proportional membership interest could be reduced to zero percent to reflect that

amount of capital he actually contributed."  *Id.*  This would be true because Paragraph 12.9

provides that a Member who makes "a capital contribution in proportion to his membership

interest will ensure that [he] *retains* his proportion of ownership in the company."  *Id.* (emphasis

added).

---

[9] Virginia Code § 13.1-1023.1 provides, in relevant part, that:  "[a] member or manager
who fails to perform in accordance with, or to comply with terms and conditions of, the
operating agreement shall be subject to specified penalties or specified consequences . . . set
forth in subsection D of § 13.1-1027."
     Virginia Code § 13.1-1027(D), in turn, provides that:  "an operating agreement may
provide in writing that the interest of any member who fails to make any contribution that he [or
she] is obligated to make shall be subject to specific penalties for, or specified consequences of,
such failure," including "reducing or eliminating the defaulting member's proportionate interest
in a limited liability company."

In opposing the current motions, BWM persistently contends that Sprenkle never made a capital contribution to BWM—either monetarily, or by contributing interest in contract rights—because the managing contracts he claimed to provide never existed. BWM goes to great lengths to establish that any Sprenkle asset, or contract, was illusory. As such, BWM contends Sprenkle could not be a "Member" of BWM.

In doing so, BWM ignores the Court's earlier invitation to specify whether Sprenkle was a Member of BWM in June of 2015, "at the time the Complaint was filed." *Id.* (noting that diversity of citizenship is determined with reference to the date on which a complaint is filed in federal court (citing *Rowland v. Patterson*, 852 F.2d 108, 112 (4th Cir.1988)). This Court presumes that, by arguing that Sprenkle never made a contribution, and had not made one in June of 2105, Schur suggests that Sprenkle's interest was "zero" at the time the Complaint was filed.

In reply, all defendants outline substantive challenges to subject matter jurisdiction, but the Healys press an argument this Court must address in the first instance. The Healys contend that even if Sprenkle did not contribute capital to BWM, he remains a Member because BWM has not offered evidence demonstrating that BWM or Schur has "taken away, acquired, or terminated Mr. Sprenkle's membership interest" under the Operating Agreement. (Healy Rebuttal Mem. Supp. Mot. Dismiss ("Healy Rebuttal") 2, ECF No. 32.) The Healys rely upon the Operating Agreement itself in making this claim. The Healys offer as Exhibit A an affidavit from Sprenkle swearing that, after he became a Member of BWM, he never received any notice of a vote to terminate, reduce, remove, or transfer his role as a Member. (Healy Rebuttal Ex. A ¶¶ 1–5, ECF No. 32-1.) He avers that he has never been declared incompetent, died, or filed for bankruptcy. (Healy Rebuttal Ex. A ¶ 6.) Sprenkle states that he has not filed to withdraw,

ceased membership, provided consent to dissolve BWM, or received a notice that another Member wishes to exercise his or her "quit option." (Healy Rebuttal Ex. A ¶¶ 7–10.)

Sprenkle's affidavit concludes by addressing the provision most relevant to BWM's argument and the provision addressed in the Court's August 2015 Opinion. Sprenkle swears that "[a]t no point in time did BWM, LLC or any member therein exercise their rights pursuant to Section 12.9 of the Operating Agreement to reduce or terminate my membership interest in BWM, LLC." (Healy Rebuttal Ex. A ¶ 10.) Sprenkle contends that he remains a member of BWM because BWM failed to follow the contractual terms to terminate his interest by invoking Paragraph 12.9. BWM never contends otherwise. Thus, the defendants' argument persuades.

Paragraph 12.9 states, in relevant part: "In the event a Member cannot or chooses not to contribute capital in proportion to his membership interest, his proportional membership interest shall be reduced to reflect the amount of capital he actually contributed." The Healys have proffered an affidavit from Sprenkle swearing that "[a]t no time [has he] ever ceased [his] membership in BWM, LLC." (Healy Rebuttal Ex. A ¶ 8.) BWM offers no evidence contradicting this sworn statement. Rather than addressing whether BWM or Schur executed the divesting power ostensibly created by Section 12.9, BWM rests on its extensive briefing regarding Sprenkle's lack of contribution. Even after the August 2015 Opinion rejected the claim that Member-status was predicated on an initial contribution, BWM never argues *how*, under the Operating Agreement, the failure to contribute rendered Sprenkle a non-member sometime before June 2015. BWM's argument misses the mark.

To the extent BWM contends that Paragraph 12.9 somehow self-executes, it offers no legal or factual bases supporting such a contention. Without evidence that BWM revoked Sprenkle's established status as a Member, *see Black Water Mgmt. LLC*, 2015 WL 5089367, at

*5 (holding that "[t]he Operating Agreement . . . 'presupposes' that the person making the initial contributions is already a member"), the Court must continue to presume that Sprenkle constitutes a Member of BWM.[10] Because Sprenkle is a citizen of Virginia, BWM is, too. *See Cent. W. Va. Energy Co.*, 636 F.3d at 103 (citation omitted). The Court therefore lacks diversity jurisdiction under § 1332, and the Complaint must be dismissed for want of subject matter jurisdiction.

## IV. Conclusion

For the foregoing reasons, the Court will grant the Motions to Dismiss. (ECF Nos. 17, 19, 28.) An appropriate order will accompany this Memorandum Opinion.

M. Hannah Lauck
United States District Judge

Richmond, Virginia
Date: 9/30/16

---

[10] Even were this Court to assume that a Member of BWM could lose *Member-status* by having his or her *membership interest* reduced to zero, the Court finds such a reading unpersuasive in light of Section 6.7, which provides: "*Other than Managing Members*, Managers may be removed from office, with or without cause, at any time by a vote [sic] a majority of the Managing Members. *Managing Members may not be removed from office.*" (Emphases added.)